UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOEL TOLBERT, III,

    Plaintiff,

    v.

CONTRA COSTA COUNTY, et al.,

    Defendants.

Case No. 5:22-cv-03546 EJD (PR)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

(Docket No. 75)

Plaintiff, a California state prisoner, filed the instant pro se civil rights action pursuant to 42 U.S.C. § 1983 against officers at the Martinez Detention Facility ("MDF") in Contra Costa County where he was formerly housed as a pretrial detainee. The first amended complaint is the operative complaint. Dkt. No. 13 ("FAC"). The Court granted in part and denied in part Defendants' motion to dismiss and ordered this matter to proceed on the merits of the following claims: (1) failure to protect claim against Defendants Sgt. Holland, Sgt. Rossi, Deputy Griffin, Deputy Cope, and Deputy Gamba; and (2) deliberate indifference to medical needs claim against Defendant Gamba. Dkt. No. 64 at 18. All other claims and defendants were dismissed from this action with prejudice. Id. at 17.

On December 17, 2024, Defendants filed a motion for summary judgment on the grounds that there is no genuine dispute of material facts and defendants are entitled to judgment as a matter of law based on various grounds, including qualified immunity and failure to exhaust administrative remedies. Dkt. No. 75.[1] Plaintiff did not file opposition

---

[1] In support of their summary judgment motion, Defendants submit declarations from the following: (1) Deputy County Counsel D. Cameron Baker with exhibits containing, among

although granted extensions of time to do so.  Dkt. No. 82.  Nevertheless, the Court will use Plaintiff's FAC, which is verified, as an opposing affidavit under Rule 56, to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995).

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED.

## DISCUSSION

## I.    Statement of Facts[2]

At all times during the underlying events, Plaintiff was a pretrial detainee at MDF.  FAC at ¶ 40.  Prior to the events underlying this action, Plaintiff was housed on A Module which housed members of the Norteño gang and compatible individuals at the time.  Dkt. No. 75 at 6 (citing Tolbert v. Contra Costa County, et al., N.D. Cal. Case No. 21-09673 EJD ("Tolbert II"), Dkt. No. 101 at 5); see also Ingersoll Decl. ¶ 3, Dkt. No. 75-10.  On October 17, 2021, Deputy John Shiffer (nonparty) allegedly disclosed to members of the Norteño gang and others that Plaintiff had "snitched" on the Norteños.  Id.

### A.    Placement on D Module

The next day, on October 18, 2021, Plaintiff was assaulted because he "tr[ied] to prevent a riot."  FAC at ¶ 12.  He refused to identify the individuals responsible for attacking him.  Tolbert Dep. at 71:14-16, Ex. A to Baker Decl. (Dkt. No. 75-3 at 7).  As a result of the incident, Plaintiff was placed in the "Administrative Management" program and classified as an "AdMan" detainee; he was then transferred to D Module which is the designated housing for inmates with AdMan status.  Ingersoll Decl. ¶ 8, Dkt. No. 75-10.

---

others, excerpts of Plaintiff's deposition from October 16, 2024, and copies of relevant grievance records (Exs. A-F), Dkt. No. 75-3; (2) Nurse Bianca, Dkt. No. 75-4; (3) Defendant N. Cope with exhibits, Dkt. No. 75-5; (4) Deputy E. Dorr with exhibits, Dkt. No. 75-6; (5) Defendant B. Gamba with exhibits, Dkt. No. 75-7; (6) Defendant J. Griffin, Dkt. No. 75-8; (7) Defendant B. Holland with exhibits, Dkt. No. 75-9; (8) Sgt. Matthew Ingersoll with exhibits, Dkt. No. 75-10; (9) Defendant A. Rossi with exhibits, Dkt. No. 75-11; and (10) Deputy R. Thomas, Dkt. No. 75-12.

[2] The following facts are not disputed unless otherwise indicated.

United States District Court
Northern District of California

Sgt. Ingersoll (nonparty) oversees the Classification Unit which is responsible for making the housing unit assignments for individuals detained in the Contra Costa County detention facilities.  Id. ¶¶ 1, 2.  The Classification Unit is also responsible for overseeing the "Protective Custody" (PC)[3] and "Administrative Management" programs.  Id. ¶ 4. Under the Administrative Management policy, the Classification Unit may place an inmate in the program where the inmate's "continued presence in the general population poses a serious threat" to others or to the inmate.  Ingersoll Decl., Ex. A at 1, Dkt. No. 75-10 at 6.

The AdMan policy has two phases; (a) a 15 day Phase I; and (b) and 30 day Phase II.  See id. at 4-5.  No individual may remain in the AdMan program past these two phases, i.e., for more than 45 days, without the approval of the Classification Sergeant, Facility Commander or designee.  Id. at 6.  The Classification Sergeant must re-evaluate the need to maintain an inmate in AdMan status every forty-five days thereafter.  Id. at 6 (par. V.B.).  Only two categories of inmates are housed on D Module: (1) inmates classified as AdMan; and (2) inmates on temporary discipline.  Ingersoll Decl. ¶ 7.  Most inmates classified as AdMan are given that classification due to the threat they pose to others.  Id. In view of the number of violent individuals housed on D Module, the free time available to inmates on that module is less than that available to inmates in other modules, including general population.  Id.  For this reason and others, one goal of the Classification Unit is to have inmates complete the AdMan program as soon as possible so that they can be re-assigned to less restrictive housing.  Id.

On December 2, 2021, Plaintiff completed both phases of the AdMan policy, i.e., had been in classification for 45 days.  Ingersoll Decl. ¶ 8.  From that point on, Plaintiff's continued classification as AdMan was at the discretion of then Classification Sergent Paul Murphy (nonparty).  Id.  On that day, Sgt. Paul Murphy requested that Defendant Griffin,

---

[3] Individuals who fear for their safety due to their charges or other reasons may request placement in the PC program.  Ingersoll Decl. ¶ 5.  PC status is often offered to individuals whom the Unite deems at risk of attack by other detainees.  Id.  PC detainees are housed only with other PC detainees.  Id.  There is a PC Module in MDF and a PC Building at the West County Detention Facility ("West County").  Id.

United States District Court
Northern District of California

1    then a Classification Deputy, contact Plaintiff to discuss alternative placements.  Griffin

2    Decl. ¶ 3, Dkt. No. 75-8.

3        Defendant Griffin had several discussions with Plaintiff regarding moving off D

4    Module to a different housing unit.  Id. ¶ 4.  Plaintiff indicated to Defendant Griffin that he

5    might be willing to request PC status if he were permitted to go to West County.  Id.

6    Although Plaintiff was not eligible to be housed at that facility due to his charges, Sgt.

7    Murphy agreed that Plaintiff could be housed at West County if he requested PC status.

8    Id.  Despite Sgt. Murphy's agreement to his condition, Plaintiff refused to request PC

9    status.  Id.  Plaintiff also indicated possible interest in Q Module where he had a "cousin."

10   Id.  Despite Defendant Griffin's efforts to persuade Plaintiff to voluntarily move to another

11   Module, he never agreed to do so.  Id.  Plaintiff made only vague references to fears for his

12   safety and did not offer any specifics or identify particular individuals or groups of

13   individuals.  Id. ¶ 5.  Based on a prior incident, Defendant Griffin was aware that Plaintiff

14   could not be housed with individuals associated with the Norteño gang; but since no such

15   individuals were housed on Q Module at that time, Defendant Griffin had no reason to

16   believe that Plaintiff had enemies on Q Module.  Id.

17       Plaintiff was not moved but remained on D Module at that time.

18   **B.    Removal from D Module**

19       According to Plaintiff, on February 2, 2022, he was told by Defendant Griffin and

20   Deputy J. Vankleeck (nonparty) that he was being moved out of D Module.  FAC at ¶ 14.

21   Plaintiff told Defendant Griffin that he could not be moved because he feared for his

22   safety, pointing out that there were other inmates who had not been forced to move nor

23   punished for refusing to move.  Id.  Defendant Griffin agreed, stating: "Yeah, you['re]

24   right. Q Module is not an option for you.  You will get beat…"  Id.  The next day, on

25   February 3, 2022, an unnamed inmate on D Module told Plaintiff that on January 16, 2022,

26   "PC Northern Rider Gang inmates Christopher Leo Barbageita and Kevin Javier

27   Mendieta" had been caught with a shank, and that they would likely stab him for snitching

28   on Norteños in October 2021 and "being cool" with Inmate McCoy whom they stabbed.

Id. at ¶ 15.  Later that day, when Defendant Griffin came to discuss his move to another module, Plaintiff "reiterated what awaits him on the modules due to events [that] occurred and that he fears for his life."  Id.  Plaintiff asked Defendant Griffin why he had to move while other inmates were allowed to remain on D Module.  Id.  Defendant Griffin responded that Plaintiff was on the "bad list" and "it's County policy."  Id.

On February 8, 2022, Sgt. Murphy decided that Plaintiff would no longer be classified as an AdMan inmate and therefore no longer eligible to be housed on D Module.  Id. ¶ 6; Ingersoll Decl. ¶ 7.  Defendant Griffin spoke with Plaintiff that day via the central control room intercom and advised him of this change in classification; Defendant Griffin also advised Plaintiff of his two options – request PC status or be housed in Q Module.  Griffin Decl. ¶ 7.  Plaintiff declined PC status, but Defendant Griffin told him he could request PC status at any time.  Id.  Defendant Griffin then notified Defendant Cope about the change in Plaintiff's classification and the fact that he was no longer eligible to be housed on D Module.  Id.; Cope Decl. ¶ 3, Dkt. No. 75-5.  Defendant Griffin advised Defendant Cope of possible alternative housing units for Plaintiff, including Q Module and West County on PC status.  Griffin Decl. ¶ 7.

That day, Defendant Cope was in the D Module's central control room from where he could communicate with the inmates via the intercom and open cell doors as appropriate.  Cope Decl. ¶ 2.  Deputy T. Ward (nonparty) was the "floor" deputy who was walking the unit.  Id.  Deputy Ward contacted Plaintiff and requested that he pack up his belongings for a move off the Module, either to Q Module or West County.  Id. ¶ 5.  Plaintiff refused, and so Deputy Ward advised him that a continued refusal would subject Plaintiff to discipline.  Id.  Plaintiff still refused to pack his belongings to move.  Id.  Consequently, Defendant Cope, who was monitoring this conversation via the intercom, wrote an incident report requesting formal discipline of Plaintiff.  Id. ¶ 6, Ex. A.  Later that day, Defendant Sgt. Rossi contacted Plaintiff to provide him with a copy of Defendant Cope's incident report and to ascertain whether Plaintiff was willing to waive the 24 hour waiting period.  Rossi Decl. ¶ 4, Dkt. No. 75-11.  Plaintiff refused to accept a copy of

United States District Court
Northern District of California

1    Defendant Cope's incident report and did not want to waive his right to wait 24 hours.  Id.

2        According to Plaintiff, he informed Defendant Griffin that he was safe on D Module

3    and did not want to move "somewhere he will be assaulted."  FAC at ¶ 16.  Defendant

4    Griffin told Plaintiff that he would be "punished" (which would involve food, family

5    visits, phone access, and lockdown) if he refused to move to Q Module.  Id.  Plaintiff again

6    stated that he would be assaulted on Q Module because it was known throughout the jail

7    that he had told on the Norteños and he did not get along with the "Richmond Gang" who

8    ran Q Module.  Id.  Defendant Griffin responded that he did not care what happened to

9    Plaintiff, and that he was following County policy.  Id.  Defendant Griffin ordered

10    Defendant Cope to "write Plaintiff up."  Id.  Defendant Griffin also told Plaintiff that if he

11    did not move, force would be used.  Id.  When Defendant Cope later told Plaintiff that he

12    had to move to Q Module, Plaintiff responded that he needed to stay on D Module "due to

13    fears for his safety," and that he had reason to believe that Inmates Barbageita and

14    Mendieta wanted to assault him.  Id.  Defendant Cope responded that he did not care, that

15    he was doing his job, and that this was the County's policy.  Id.  He also informed Plaintiff

16    that he could not stay on D Module and that he was on the "bad list."  Id.  Defendant Cope

17    then threatened Plaintiff with disciplinary action and that they would "make" Plaintiff

18    leave.  Id.  According to Plaintiff, he then agreed to leave "but was still written up."  Id.

19        Defendant Cope denies being present at the time Plaintiff agreed to move and

20    asserts he had no role in any decision to house Plaintiff in Q Module.  Cope Decl. ¶ 8.

21    Defendant Cope also denies that Plaintiff told him on February 8, 2022, that he feared for

22    his safety from any specific individual or group.  Id. ¶ 10.  Defendant Griffin also denies

23    that Plaintiff made any statements regarding fears for his safety if housed on Q Module

24    due to the presence of "Swerve Team" members.  Griffin Decl. ¶ 11.

25        The following day, on February 9, 2022, Defendants Sgt. Holland and Rossi came

26    to D Module to give Plaintiff a disciplinary hearing, which took place in one of the visiting

27    rooms.  FAC at ¶ 16; Rossi Decl. ¶ 5; Holland Decl. ¶ 5, Dkt. No. 75-9.  Deputy Dorr

28    (nonparty) was one of the D Module deputies at that time.  Dorr Decl. ¶ 2, Ex. A, Dkt. No.

75-6.  Defendants Rossi and Holland advised Plaintiff that he could move to a PC Module in addition to Q Module if he wanted.  Rossi Decl. ¶ 5; Holland Decl. ¶ 5; Dorr Decl. ¶ 2. Plaintiff declined to move, so the Sergeants determined he was guilty of Defendant Cope's charges and imposed discipline on Plaintiff.  Id.  After the Sergeants left, Plaintiff began to repeatedly and rapidly press the intercom button while making statements about not going PC and being written up.  Dorr Decl. ¶ 3.  After approximately five minutes of this type of behavior, Plaintiff stated, "send me to Q-mod ain't going PC [*sic*]."  Id.  When Deputy Dorr asked Plaintiff why he changed his mind, Plaintiff said he "didn't care and he wanted to go to Q Module."  Id.  Deputy Dorr instructed Plaintiff to pack his belongings and then notified Deputy Davis (nonparty) of Plaintiff's decision to go to Q Module.  Id., Ex. A. Pursuant to Plaintiff's request, he was moved to Q Module later that day.  Id.

According to Plaintiff, he told Defendants Holland and Rossi that he could not move to Q Module "due to accusations of me snitching that spread through jail and enemy concerns with North Richmond Serve Team Gang" and that "your sending me to my enemy's module you are trying to kill me [*sic*]."  FAC at ¶ 17.  Defendants told Plaintiff that he would "continuously be written up if you don't go."  Id.  Defendant Rossi also turned off the camera and told Plaintiff that they "hope[d] Plaintiff gets f*cked up every single day you are suing us you bitch."  Id.  Defendant Holland told Plaintiff that no one would help him, that he was on the "bad list," and that they could let him stay in D Module but were not going to allow it.  Id.  Defendants Holland and Rossi kept repeating that "it's the County's policy" and that Plaintiff was chosen to move.  Id.  Plaintiff repeated his fears but agreed to go "wherever you guys send me" to avoid getting written up which would prevent his release.  Id.

According to Defendants Rossi and Holland, Plaintiff did not make any statements respecting the Swerve Team during the disciplinary hearing, nor did he make any statements indicating indifference to any actual risk of harm to Plaintiff.  Rossi Decl. ¶ 8; Holland Decl. ¶ 10.  Defendant Rossi also states that he did not record any portion of the hearing.  Rossi Decl. ¶ 8.  According to Defendants, none of them were aware at that time

United States District Court
Northern District of California

1    of any specific threats to Plaintiff's safety if he moved to Q Module.  Holland Decl. ¶ 9;

2    Rossi Decl. ¶ 7; Griffin Decl. ¶¶ 5, 11; Cope Decl. ¶ 9.  Furthermore, none of them had the

3    ability to keep Plaintiff classified as an AdMan inmate eligible to be housed in D Module.

4    Holland Decl. ¶ 3; Rossi Decl. ¶ 3; Cope Decl. ¶ 3; Griffin Decl. ¶ 6.

5         Plaintiff was charged with "Code 32 insubordinate/insolent" and "Code 60 refuse to

6    obey order," and received 10 days lockdown and 3 weeks loss of privilege for "not

7    moving."  FAC at ¶ 18.  The disciplinary report states that Plaintiff was given several

8    choices – "WCDF/Q/Protective Custody," but that he "refused all."  Rossi Decl., Ex. A,

9    Dkt. No. 75-11 at 5; Holland Decl., Ex. A, Dkt. No. 75-9 at 5.

10        The next day, February 11, 2022, Plaintiff wrote an appeal to the facility

11   commander, complaining that he did not want to go to Q Module and was coerced with

12   punishment to go.  Id. at ¶ 19.  He attempted to get sanctions and punishment quashed.  Id.

13        Throughout February 2022, Plaintiff submitted several grievances and appeals

14   complaining about Defendants Griffin, Holland, and Rossi.  Holland Decl., Exs. B, C, D;

15   Rossi Decl., Exs. B, C.  These grievances do not mention Defendant Cope.  Id.

16   Defendants Holland and Rossi responded to the various grievances.  Id.

17        **C.**    **Alleged Attacks on Q Module**

18        According to Plaintiff, on February 20, 2022, he was attacked by "North Richmond

19   Swerve Team" gang members, who cut and struck him several times.  FAC at ¶ 22.  Staff

20   failed to call for medical help or a "code for a fight" to protect Plaintiff from continued

21   beating.  Id.  Plaintiff also alleges that on or around March 15, 2022, he was again attacked

22   by gang members and staff again failed to call a medical code or code for a fight.  Id. at ¶

23   23.  Plaintiff was struck and kicked several times and suffered an asthma attack.  Id.

24   According to Defendants, there is no record of these attacks.  Baker Decl. ¶ 3.

25        According to Plaintiff, in mid-March 2022, he told Deputy White (nonparty) that he

26   had been "beaten and extorted for commissary and having to pay inmates to use the

27   phone."  FAC at ¶ 24.  Between March 13 through 19, 2022, Plaintiff did not come out of

28   his cell for free time.  Id.  On March 20, 2022, Plaintiff experienced extreme migraine,

fatigue, chest pain, dizziness, and random nosebleeds from the beatings.  Id.  Between March 20 through 22, 2022, Plaintiff told Deputy Durant (nonparty) that he needed to be removed from Q Module or will be jumped again during the last 15 minutes of free time. Id. at ¶ 25.  Deputy Durant called for backup and Plaintiff was not beaten due the presence of numerous deputies.  Id.  Around this time, Plaintiff told Deputy Jaroncyck (nonparty) during transport that he had been jumped twice since being moved to Q Module.  Id.  On March 24, 2022, Plaintiff told mental health that he did not want to live on Q Module due to the "beatings and extortion and lack of sleep." Id. at ¶ 26.

According to Plaintiff, on March 25, 2022, the "shot caller" on the North Richmond module told Plaintiff that he could not use the phone because he snitched, been housed on a rival gang's module, and still owes money.  FAC at ¶ 27.  Plaintiff states Defendant Gamba watched this exchange and laughed.  Id.  Then Plaintiff was attacked by several inmates and passed out for about three minutes.  Id.  When Defendant Gamba woke him, Plaintiff again informed Defendant that he "can't be here and that he keeps getting beaten." Id. at 7, ¶ 27.  When Defendant Gamba left with a vaccine nurse, Plaintiff was again attacked by inmates who took his cane, hit him in the head, and chased him.  Id. Plaintiff asserts Defendant Gamba watched and laughed while this occurred.  Id.  He also states that Defendant Gamba refused to call medical code or a code for a fight.  Id.  Later that night, Plaintiff told Deputy Cowan that if he is not moved, he would hang himself.  Id. Deputy Cowan responded, "You have to stay, classification won't move you." Id.

According to Defendants, Defendant Gamba was working on Q Module for the day shift on March 25, 2022.  Gamba Decl. ¶ 2, Ex. A, Dkt. No. 75-7.  At approximately 12:55 p.m., he was escorting Nurse Bianca on the upper tier of that module as she asked inmates whether they would like a Covid vaccine, when he heard shouting from below; this was during free time for cells 1-20, on the lower tier.  Id. ¶ 3.  He looked over the rail and observed Plaintiff yelling at two other men who were sitting at a table in the middle of the lower tier.  Id. ¶ 4.  He directed Plaintiff to return to his cell, and observed him do so.  Id. ¶ 5.  He then escorted Nurse Bianca off the module while keeping his attention on Plaintiff

9

and the two other inmates.  Id.  After Nurse Bianca left the module, Defendant Gamba closed Plaintiff's cell door and advised him that his free time was up.  Id. ¶ 6.  Neither Defendant Gamba nor Nurse Bianca observed any physical altercation involving Plaintiff on that day.  Id. ¶ 7; Bianca Decl. ¶¶ 3-4.  At approximately 1:10 p.m., Defendant Gamba spoke with Plaintiff, asking him if he feared for his safety.  Gamba Decl. ¶ 8.  Plaintiff stated that he did not feel safe on the module but declined Protective Custody when Defendant Gamba offered it.  Id.  Plaintiff did not appear to have any injuries and did not report being in a physical altercation or needing medical assistances.  Id.; Baker Decl., Ex. B (March 26, 2022 Photo).  Defendant Gamba documented this encounter in an incident report.  Gamba Decl., Ex. A.  Plaintiff did not report any attack or need for medical assistance to Deputy R. Thomas who had the next shift.  Thomas Decl. ¶ 2, Dkt. No. 75-12.

Plaintiff submitted an appeal on March 25, 2022.  Baker Decl., Ex. D (March 25, 2022 Appeal).  That appeal sought to have him taken off Q Module.  Id. at 1-2.  Plaintiff submitted another grievance to Deputy Cowan the next day, March 26, 2022.  Baker Decl., Ex. C (March 26, 2022 Grievance).  Plaintiff addressed that grievance to "Classification" and sought to be taken off Q Module.  Id.  The grievance did not assert any failure to protect by Gamba or any failure to call for medical assistance by Gamba, but did note, *inter alia*, that Deputy Gamba "witnessed multiple inmates jump me & one chase me down with my cane."  Id.  Plaintiff did not appeal this response.  Baker Decl. ¶ 6.  Defendant Gamba denies making such a statement or seeing anyone chase Plaintiff with a cane.  Gamba Decl. ¶ 9.

After Plaintiff was taken off Q Module, he was interviewed on March 26, 2022, by two deputies, Deputies Gallagher and Hoffman (nonparties), regarding whether he suffered any batteries while on Q Module.  Baker Decl., Ex. E (transcript of March 26, 2022 Interview).  He informed the deputies about why he was attacked on March 25, 2022:

> …they had already, like, shown me knives and shit (inaudible) like you're going to have to pay if you want to stay here, and shit like that.

… Thursday I was supposed to pay, and they're just, like, you can't use the phones…

… I was on the phone talking, and he came over, and he's, like, you've got to get the fuck off the phone… The dep went up there with the COVID lady who was going around asking if everyone wanted a COVID shot, or whatever, the nurse.

And then they came at me right there.

Id. at 4. When asked later, "How did it escalate to a physical fight," Plaintiff responded, "They said, 'Get the fuck off the phone,' and I was still on the phone. That's how." Id. at 11. Plaintiff also identified where he was allegedly injured, i.e., to his head. Id. The deputies took photos, including one of Plaintiff's face. Baker Decl., Ex. B. During the interview, Plaintiff also requested to be seen by medical. Baker Decl., Ex. E at 15, 16. He was examined by two nurses and sent to the Emergency Room as a precautionary measure due to a possible head injury.

According to Plaintiff, on March 26, 2022, inmates armed with shanks attempted to break into his cell but fled when Plaintiff called for help. FAC at ¶ 28. Before free time, Plaintiff was transferred to D Module where he was treated by Nurse Erwin. Id. That afternoon, Plaintiff was taken to the hospital for further treatment for his injuries, including traumatic brain injury. Id. He was discharged that night. Id.

Plaintiff claims Defendants Holland, Rossi, Griffin, Cope, and Gamba acted with deliberate indifference to his safety needs when they failed to protect him from violence at the hands of gang members by moving him to a part of the jail where he would be at risk of an attack. FAC at ¶ 42. He also claims Defendant Gamba acted with deliberate indifference to medical needs. Id. at ¶ 43.

## II.    Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment

"against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Cattrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  See Celotex Corp., 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" Celotex Corp., 477 U.S. at 324 (citations omitted); Fed. R. Civ. P. 56(e).  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence." In re Oracle Corporation Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Liberty Lobby, 477 U.S. at 252).  "The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." Id. (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  "In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." Id. (citing Liberty Lobby,

United States District Court
Northern District of California

477 U.S. at 252).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  Celotex Corp., 477 U.S. at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact.  See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.  It is not the task of the district court to scour the record in search of a genuine issue of triable fact.  Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment.  Id.  If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party.  See id.; see, e.g., Carmen v. San Francisco Unified School District, 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A.    **Failure to Protect**

A pretrial detainee is not protected by the Eighth Amendment's Cruel and Unusual Punishment Clause because he has not been convicted of a crime.  See Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979).  A pretrial detainee instead is protected from punishment without due process under the Due Process Clause of the Fourteenth Amendment.  See United States v. Salerno, 481 U.S. 739, 746-47 (1987); Bell, 441 U.S. at 535-36.  But under both clauses, an inmate bringing a failure-to-protect claim must show that the prison official acted with deliberate indifference.  Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1068 (9th Cir. 2016) (en banc).

But whereas a convicted prisoner must prove an individual defendant's subjective awareness of a risk of harm in order to prevail on a failure-to-protect claim under the Eighth Amendment, a pretrial detainee need not do the same in order to prevail on a failure-to-protect claim under the Fourteenth Amendment.  Id. at 1068-70 (holding that objective standard of Kingsley v. Hendrickson, 576 U.S. 389 (2015), applicable to

excessive force claims brought by pretrial detainees, also applies to failure-to-protect claims brought by pretrial detainees). Specifically, a pretrial detainee need not "prove an individual defendant's subjective intent to punish in the context of a . . . failure-to-protect claim." Id. at 1070. A pretrial detainee who asserts a due process claim for failure to protect instead must prove "more than negligence but less than subjective intent -- something akin to reckless disregard." Id. at 1071.

The elements of a pretrial detainee's due process failure-to-protect claim against an individual officer are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved -- making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

Id. (footnote omitted). With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case. Id. (citing Kingsley, 576 U.S. 389, 396). See, e.g., id. at 1071-73 (substantial evidence supported jury's verdict for plaintiff on failure-to-protect claim where defendants understood that placing intoxicated plaintiff in a cell with an enraged and combative inmate, when the cell had no audio or video surveillance and only occasional monitoring, could lead to serious violence against plaintiff).

Defendants assert that Plaintiff's deliberate indifference claim against Defendants Holland, Rossi, Griffin, and Cope fails because he does not satisfy elements one, three, and four of Castro, 833 F.3d at 1071. Dkt. No. 75 at 11. Defendants contend that the decision to move Plaintiff off D Module was made by then Classification Sergeant Paul Murphy on February 22, 2022, and none of the Defendants made that decision. Id. at 11.

United States District Court
Northern District of California

Furthermore, Defendants assert none of them had the authority to over-ride Sgt. Murphy's decision under the AdMan policy.  Id.  On February 8, 2022, Plaintiff had been in the AdMan program in excess of 45 days, and therefore only Sgt. Murphy or the MDF Facility Commander could keep Plaintiff classified as AdMan and thereby eligible to be housed in D Module.  Id. at 11-12.   Defendants also assert that none of them knew where Plaintiff would be housed; Defendants Holland, Rossi, and Griffin all knew that Plaintiff had multiple housing options and Defendant Cope's involvement was to request formal discipline for Plaintiff's refusal to move.  Id. at 12.  Defendants assert that the evidence shows Plaintiff himself elected to go to Q Module as opposed to requesting PC status and being housed in E Module or at West County.  Id.  Defendants also contend that none of the defendants had any knowledge that Plaintiff had any personal enemies on Q Module, and therefore Plaintiff cannot establish that a reasonable officer, knowing what they knew, would have appreciated the high risk of attack faced by Plaintiff if housed in Q Module. Id. Lastly, Defendants assert that Plaintiff cannot establish the fourth factor for causation because Plaintiff was allegedly attacked not for being a snitch on the Norteños, but because he refused to pay money to the Swerve Team to use the phones and stay on the module.  Id. at 13.  In response, Plaintiff has filed no opposition to dispute Defendants' arguments.

After a careful review of the evidence and construing facts in the light most favorable to Plaintiff when appropriate, the Court finds there are no genuine issues of material fact as to whether Defendants Holland, Rossi, Griffin, Cope and Gamba acted with deliberate indifference by failing to protect Plaintiff.  Defendants appear to concede that Plaintiff satisfies the second element under Castro, i.e., the decision to move him out of D Module put him at a substantial risk of suffering serious harm.  However, Plaintiff's failure to establish the existence of the other three essential elements is fatal to his claim.

It is undisputed that Plaintiff completed the two phases for AdMan on December 2, 2021, and that his continued classification as AdMan was thereafter at the discretion of Sgt. Murphy as the Classification Sergeant.  See supra at 4.  It appears that due to

United States District Court
Northern District of California

Plaintiff's unwillingness to move to either Q Module or request PC status, Sgt. Murphy kept him on AdMan status and allowed him to remain on D Module for another two months. Id. Then in February 2022, Sgt. Murphy decided to take Plaintiff off AdMan status, which required Plaintiff be transferred out of D Module.[4] Id. at 5. It is undisputed that it was Sgt. Murphy's decision to remove Plaintiff from AdMan status which necessitated moving him out of D Module, and that none of the named Defendants had any involvement in that decision. Rather, they were merely executing the decision that had been made by Sgt. Murphy. Accordingly, Plaintiff fails to satisfy the first element, i.e., that each defendant made an intentional decision with respect to Plaintiff's conditions of confinement. See Castro, 833 F.3d at 1071.

Plaintiff also fails to satisfy the third element, i.e., failure of Defendants to take reasonable available measures to abate the risk of serious harm to Plaintiff. It is undisputed that under the Administrative Management policy, Sgt. Murphy had the authority to remove Plaintiff's AdMan status if appropriate and that such a change required his removal from D Module. See supra at 3. Plaintiff's vague assertion that there were other inmates who had not been forced to move is not sufficient to establish that Defendants acted unreasonably in removing him from D Module in February 2022. Even assuming as true that Plaintiff shared his fears with Defendants, it is undisputed that they offered PC status, including a transfer to West County, as an alternative to Q Module. Id. at 4-5. Plaintiff does not dispute that he chose to move to Q Module rather than request PC status despite his fears of attack. Id. at 7. Nowhere does Plaintiff allege that PC was an unreasonable alternative or explain why he chose not to accept it. Accordingly, the evidence establishes that Plaintiff's housing in Q Module was a result of his choice rather than a failure on the part of Defendants to take reasonable available measures to abate a risk to Plaintiff.

---

[4] The dispute over whether this decision occurred on February 2, 2022, or February 8, 2022, is immaterial.

Because Plaintiff cannot satisfy the third element, it follows that he cannot satisfy the fourth, *i.e.*, by not taking such measures, defendants caused Plaintiff's injuries. Rather, the undisputed evidence shows that despite voicing fears of attack from other inmates, Plaintiff refused to accept PC status but chose to be housed in Q Module. Accordingly, even assuming that Plaintiff was attacked on February 20, 2022 and March 15, 2022, it cannot be said that it was due to Defendants' failure to take reasonable measures when they made Plaintiff aware that he could request PC status at any time. Rather, it was Plaintiff's choice not to take PC status that placed him at risk in the first place and his continued refusal to request it after each alleged attack. His complaints to nonparties during the latter half of March 2022, about remaining on Q Module is irrelevant to his claims against named Defendants. See supra at 9. Lastly, the undisputed evidence is that Plaintiff was attacked on Q Module on March 25, 2022, not for snitching on the Norteños but for failing to pay gang members to use the phone. See supra at 13. Because that attack was under threatening circumstances that arose in Q Module after Plaintiff was moved, it cannot be said that Defendants acted with deliberate indifference to a threat that did not yet exist.

With respect to the deliberate indifference claim against Defendant Gamba, Defendants assert that there is no evidence that Defendant Gamba failed to protect Plaintiff from harm. Dkt. No. 75 at 14. Defendants rely on Plaintiff's interview with two deputies the day after the alleged attack on March 25, 2022. Dkt. No. 75 at 14. In the FAC, Plaintiff alleged that he was attacked twice on that day and Defendant Gamba did nothing. Dkt. No. 13 at ¶ 27. In contrast to these allegations, Defendants point out that Plaintiff only reported one attack that day in his interview. See supra at 11. Furthermore, Defendants assert that Plaintiff did not claim that Defendant Gamba saw the attack, only that Defendant Gamba "went up there to two [top tier]" during the incident, even while he was being chased with his cane. Id. There is also the testimony of Nurse Bianca who attests that she did not witness any attack that day, and that Defendant Gamba ordered the inmates to separate without incident. See supra at 10. Plaintiff has filed no opposition to

1  dispute his statements made during the interview or the other evidence submitted by

2  Defendants.

3        After reviewing the facts in the light most favorable to Plaintiff, the Court finds

4  there is no genuine dispute of material facts with regard to the deliberate indifference claim

5  against Defendants Gamba.  According to Plaintiff's statements the day after the attack,

6  the inmates first "got the deputy to go upstairs" before attacking Plaintiff.  Baker Decl.,

7  Ex. E at 11-12.  This statement by Plaintiff indicates that Defendant Gamba was not

8  actually present or even close enough to be able to prevent the attack.  Accordingly, there

9  is insufficient evidence by which a jury could reasonably find that Defendant Gamba made

10  an intentional decision regarding Plaintiff's conditions of confinement which put him at a

11  substantial risk of serious harm or that Defendant Gamba failed to take reasonable

12  available measures to abate such a risk and thereby caused Plaintiff's injuries.  In sum,

13  Plaintiff fails to establish the existence of anything more than a "scintilla of evidence" to

14  support his claim against Defendant Gamba.  In re Oracle Corporation Securities

15  Litigation, 627 F.3d at 387.

16        Based on the undisputed facts, Defendants have shown there is an absence of a

17  genuine dispute of material fact with respect to his failure to protect claim against

18  Defendants Holland, Rossi, Griffin, Cope, and Gamba.  See Celotex Corp., 477 U.S. at

19  323.  Having filed no opposition, Plaintiff has failed to meet his burden of identifying with

20  reasonable particularity the evidence that precludes summary judgment, see Keenan, 91

21  F.3d at 1279, or submit evidence from which a jury could reasonably render a verdict in

22  his favor, In re Oracle Corporation Securities Litigation, 627 F.3d at 387.  Accordingly,

23  Defendants Holland, Rossi, Griffin, Cope, and Gamba are entitled to summary judgment

24  on this claim.  See Celotex Corp., 477 U.S. at 323.

25        Because the Court finds no constitutional violation, it need not reach Defendants'

26  qualified immunity argument.  Dkt. No. 75 at 14.

27

28

United States District Court
Northern District of California

### B.    Deliberate Indifference to Medical Needs

Plaintiff claims Defendant Gamba failed to summon medical aid after the March 25, 2022 incident.

A claim for a violation of a pretrial detainee's right to adequate medical care arises under the Fourteenth Amendment rather than the Eighth Amendment.  See Gordon v. County of Orange, 888 F.3d 1118, 1122 & n.4 (9th Cir. 2018).  The claim is evaluated under an objective deliberate indifference standard.

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

Id. at 1125.  With regard to the third element, the defendant's conduct must be objectively unreasonable – "a test that will necessarily turn[] on the facts and circumstances of each particular care." Id. (citations and internal quotation marks omitted).  The four-part test articulated in Gordon requires the plaintiff to prove more than negligence, but less than subjective intent –something akin to reckless disregard.  Gordon, 888 F.3d at 1125.

Defendants assert that there is no evidence that Plaintiff needed medical assistance on that day.  Dkt. No. 75 at 15.  Defendant Gamba states that he did not see any physical altercation between Plaintiff and other inmates or observe any injuries on any of them.  Id., citing Gamba Decl. ¶ 8.  Defendants also assert that Plaintiff did not request medical assistance from Deputy Thomas during the following shift.  Id., citing Thomas Decl. ¶ 2.  Defendants point out that Plaintiff did not make any request for medical assistance until his interview the following day.  See supra at 11.  Lastly, Defendants assert that the photo taken of Plaintiff during the interview does not show any bruising or obvious injuries, corroborating Defendant Gamba's testimony.  Baker Decl., Ex. B.  Defendants assert that

United States District Court
Northern District of California

in sum, the evidence establishes that Plaintiff did not need medical assistance on March 25, 2022, and therefore Defendant Gamba did not fail to call for medical assistance.  Dkt. No. 75 at 15.  Plaintiff has filed no opposition to dispute Defendants' argument or the evidence submitted by Defendants.

After viewing the evidence in the light most favorable to Plaintiff when appropriate, the Court finds there are no genuine issues of material fact as to whether Defendant Gamba acted with deliberate indifference to Plaintiff's medical needs under Gordan.  Even assuming that Plaintiff was attacked, the undisputed evidence is that Defendant Gamba was unaware that an attack occurred, Plaintiff did not appear injured or in need of medical assistance, and Plaintiff did not request medical assistance from Defendant Gamba or Defendant Thomas that day.  The photo of Plaintiff's face the day after the attack does not show any obvious injuries that would have caused a reasonable official in the circumstances to appreciate the high degree of risk involved if he did not get medical care for Plaintiff.  Nor is there any allegation that by failing to take any reasonable available measures, Defendant Gamba caused Plaintiff's injuries.  In sum, it cannot be said that the evidence is such that a jury could reasonably find Defendant Gamba was deliberately indifferent to Plaintiff's medical needs after the March 25, 2022 incident.

Based on the undisputed facts, Defendants have shown there is an absence of a genuine dispute of material fact with respect to the medical claim against Defendant Gamba.  See Celotex Corp., 477 U.S. at 323.  Plaintiff has failed to meet his burden of identifying with reasonable particularity the evidence that precludes summary judgment, see Keenan, 91 F.3d at 1279, or submit evidence from which a jury could reasonably render a verdict in his favor, In re Oracle Corporation Securities Litigation, 627 F.3d at 387.  Accordingly, Defendant Gamba is entitled to summary judgment on this claim.  See Celotex Corp., 477 U.S. at 323.

Because the Court finds no merit to the claims against Defendants Cope and Gamba, it need not address Defendants' failure to exhaust administrative remedies argument.  Dkt. No. 75 at 16-17.

1

United States District Court
Northern District of California

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated above, Defendants Sgt. Holland, Sgt. Rossi, Deputy Griffin, Deputy Cope, and Deputy Gamba's motion for summary judgment is **GRANTED**.  The failure to protect and deliberate indifference to medical needs claims against Defendants are **DISMISSED** with prejudice.

This order terminates Docket No. 75.

**IT IS SO ORDERED.**

**Dated:**  September 30, 2025

EDWARD J. DAVILA
United States District Judge